## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA

**KIMBERLY MERILUS,**

    Plaintiff,

**v.**

    Case No. _____

    **JURY TRIAL DEMANDED**

**MCKIBBON HOSPITALITY, LLC,
and NF IV – VA SSCI TAMPA CD,
LLC,**

    Defendants,

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, KIMBERLY MERILUS (hereinafter referred to as "Plaintiff" or "Ms. Merilus"), by and through her undersigned counsel, Derek Smith Law Group, PLLC, hereby complains of Defendants, MCKIBBON HOSPITALITY, LLC (hereinafter referred to as "Defendant McKibbon") and NF IV – VA SSCI TAMPA CD, LLC (hereinafter referred to as "Defendant Noble") (collectively, the "Defendants"), and alleges as follows:

## INTRODUCTION

1.    This case involves a pregnant woman who was discriminated against, retaliated against, and unlawfully terminated by her employer on the basis of her sex and pregnancy under the guise of a hotel acquisition and staff consolidation.

2.     Plaintiff Kimberly Merilus brings this action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e *et seq.* ("Title VII"), the Florida Civil Rights Act of 1992, § 760.01, Florida Statutes *et seq.* ("FCRA"), and the City of Tampa Human Rights Ordinance, § 12-26, City of Tampa, Code of Ordinances *et seq.* ("THRO").

3.     Ms. Merilus seeks monetary relief to redress the Defendants' unlawful employment practices in violation of Title VII, the FCRA, and the THRO. Additionally, this action seeks to redress Defendants' deprivation of Ms. Merilus' personal dignity and her civil right to pursue equal employment opportunities.

4.     At bottom, Defendants violated Title VII, the FCRA, and the THRO by discriminating against Ms. Merilus on the basis of her sex and retaliating against Ms. Merilus for opposing the Defendants' discriminatory conduct.

## PARTIES

5.     Plaintiff Merilus is an individual female residing in the State of Florida, who was pregnant at the time of her termination.

6.     Defendant McKibbon is a Florida Limited Liability Company, with its principal place of business located at 5315 Avion Park Drive, Suite 170, Tampa, Florida 33607.

7.     Defendant Noble is a Foreign Limited Liability Company registered in the State of Florida, with its principal place of business located at 2000 Monarch Tower, 3424 Peachtree Road, N.E., Suite 2000, Atlanta, Georgia, 30326.

8.     Upon information and belief, Defendant McKibbon and Defendant Noble were the Plaintiff's joint and/or sole employer.

9.     The exact number of employees of Defendants is unknown, but upon information and belief, there are well more than the statutory minimum under Title VII, the FCRA, and the THRO.

10.    Defendants are an "employer" within the meaning of 42 U.S.C. § 2000e(b).

11.    Defendants are a "person" within the meaning of § 760.02(6), Florida Statutes, and an "employer" within the meaning of § 760.02(7), Florida Statutes.

12.    Defendants are an "employer" within the meaning of § 12-17, City of Tampa, Code of Ordinances.

## JURISDICTION AND VENUE

13.    This Court has jurisdiction over this matter pursuant 28 U.S.C. §§ 1331. This action is authorized and instituted pursuant to 42 U.S.C. § 2000e-5(f)(1), § 760.11(1), Florida Statutes, and § 12-48(e) City of Tampa, Code of Ordinances.

14.     Venue is proper in this Court under 28 U.S.C. §1391 because the unlawful employment practices alleged below were committed within the jurisdiction of the United States District Court for the Middle District of Florida.  The Defendants' business was and is still located in this judicial district and a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this district.

## ADMINISTRATIVE PREREQUISITES

15.     The Plaintiff has complied with all administrative requirements.

16.     On or about January 26, 2022, Plaintiff timely dual-filed a charge of discrimination (Charge No. 511-2022-01041) against Defendant McKibbon with the U.S. Equal Employment Opportunity Commission ("EEOC"), the Florida Commission on Human Relations ("FCHR"), and the Tampa Office of Human Rights ("TOHR").

17.     On or about January 26, 2022, Plaintiff timely dual-filed a charge of discrimination (Charge No. 511-2022-01042) against Noble Investment Group, LLC, with the EEOC, the FCHR, and the TOHR.

18.     Plaintiff mistakenly named Noble Investment Group, LLC, in Plaintiff's EEOC Charge of Discrimination, instead of Defendant Noble, which is a corporate subsidiary and/or related business entity to Noble Investment Group, LLC.

4

19.   Plaintiff was unable to ascertain Defendant Noble as the proper named party because Noble Investment Group, LLC, and Defendant Noble share an identity of interest and both conduct business under the name "Noble Investment Group".

20.   In fact, Defendants' own press release regarding the acquisition of the hotels, which, in part, gave rise to this action states that ""Noble Investment Group announced the acquisition of Hampton Inn and Home2Suites by Hilton Tampa Downtown…", despite the fact that Defendant Noble (NF IV – VA SSCI TAMPA CD, LLC), was the entity actually making the acquisition.[1]

21.    Defendant Noble received adequate notice of Plaintiff's EEOC charge and was not prejudiced by Plaintiff's naming error.

22.   On or about October 7, 2022, the EEOC issued Plaintiff's Right to Sue notice against Defendant McKibbon.

23.   On or about October 7, 2022, the EEOC issued Plaintiff's Right to Sue notice against Noble Investment Group, LLC.

24.   Plaintiff is timely commencing this action within ninety (90) days of receipt of the EEOC Right to Sue notice.

---

[1] *See Noble Acquires the Hampton Inn and Home2Suites by Hilton Tampa Downtown | Channel District*, NOBLE INVESTMENT GROUP (July 23, 2021), https://www.nobleinvestment.com/noble-insights/noble-acquires-the-hampton-inn-and-home2suites-by-hilton-tampa-downtown-channel-district.

## FACTUAL ALLEGATIONS

25.     In or around November of 2018, LIBERTY TAMPA HOLDINGS, LLC d/b/a Hampton/Home2 Tampa (hereinafter referred to as "Liberty Group") hired Ms. Merilus as the "Complex Director of Sales for Hampton and Home2 hotels."

26.     Ms. Merilus' responsibilities included accountability for the revenue generation of the Hampton and Home 2 properties and reporting to the Vice President of Sales & Marketing.

27.     Ms. Merilus was an excellent employee, having a record of salary increases, including regular bonuses and high-performance evaluations.

28.     Ms. Merilus had exceeded performance expectations.  In fact, due to her outstanding performance, she received a 2-3% increase in compensation year-over-year prior to her pregnancy.

29.     Between 2018 and 2021, Ms. Merilus booked more than $8,000,000 in total revenue for Hampton and Home 2 Suites. Ms. Merilus had also booked an additional $1,660,000 in upcoming business for Hampton and an additional $837,603 in upcoming business for Home 2 Suites. Ms. Merilus was on pace to meet/exceed all goals set for 2021.

30.     In or around mid-May of 2021, Liberty Group announced to its employees that Liberty Group was selling the Hampton Inn and Home 2 Suites properties to Noble Investment Group.

31.    Liberty Group informed its employees that Noble Investment Group would be contracting with Defendant McKibbon to operate and manage its hotels. As part of the acquisition, all of the Liberty Group employees working at the Hampton Inn and Home 2 Suites properties would become employees of Defendant McKibbon and continue in their roles.

32.    Ms. Merilus later realized that despite the announcement being described as "Noble Investment Group" purchasing the properties, it was actually Defendant Noble, a related corporate entity of Noble Investment Group making the acquisition of the properties. Thus, Defendant Noble was acquiring the hotels and contracting with Defendant McKibbon to manage and operate the hotels, acting together as a joint employer.

33.    After the announcement, STACY ROYALTY (hereinafter referred to as "Royalty"), General Manager of the Hampton Inn and Home 2 Suites properties spoke with RICK HENRICKSON (hereinafter referred to as "Henrickson"), Chief Operating Officer of Liberty Group, and confirmed to Liberty Group employees that all of the existing managers, including Ms. Merilus, would keep their positions as part of the acquisition.

34.    On or about May 30, 2021, Defendant McKibbon created a job posting for a Market Director of Sales position, for the Courtyard by Marriott and the Residence Inn in Downtown Tampa.

35.    Defendant McKibbon had been managing the Courtyard by Marriott and Residence Inn in Downtown Tampa for some time and as a result, it appeared to Ms. Merilus that there was no cause for concern since Defendant McKibbon was simply filling a vacancy.

36.    As of this date, Ms. Merilus believed she would continue to be the Market Director of Sales for the Hampton Inn and Home 2 Suites hotels. All of Ms. Merilus' colleagues believed the same to be true and operated under the assumption Ms. Merilus would work with them after the acquisition was finalized.

37.    Ms. Merilus knew she was going to be taking maternity leave in the near future and wanted to make Defendants aware of this, believing it would be prudent to inform them early on so that they could accommodate her. Ms. Merilus did not think that discussing her need for maternity leave would result in Defendants unlawfully discriminating and retaliating against her.

38.    On or about June 2, 2021, a representative for Liberty Group introduced Merilus via e-mail, to BEN HOM (hereinafter referred to as "Hom"), Defendant McKibbon's Vice President of Human Resources, to address Ms. Merilus' questions regarding the transition period, its implications on her pregnancy, and her forthcoming plans to take maternity leave. The representative for Liberty Group introduced Ms. Merilus as "our talented and invaluable Director of Sales at the Hampton Inn/Home 2."

8

39.     On or about June 3, 2021, Ms. Merilus and Hom met to discuss her pregnancy, her October due date, and her intent to take maternity leave. Hom explained how the benefits would work and asked Ms. Merilus to send him her current benefit package to share with Defendant McKibbon's Transition & Acquisition Team.

40.     On or about June 8, 2021, Ms. Merilus followed up with Hom, and attached the benefits documents Hom had requested. Hom failed to reply to Ms. Merilus.

41.     On or about June 8-9, 2021, just days after putting Defendants on notice of Ms. Merilus' intent to take maternity leave, Defendant McKibbon renamed and reposted their original job advertisement entitled "Market Director of Sales Courtyard and Residence Inn Tampa Downton" to "Market Director of Sales-Tampa Downtown."

42.     This new job posting stated that Defendant McKibbon was "now hiring Market Director of Sales for Four Downtown Tampa Hotels." Ms. Merilus' current job title and job duties were incorporated into the new Market Director position for the four (4) hotels, making it evident that Defendants intended to unlawfully terminate Ms. Merilus under the guise of the acquisition.

43.     The job posting stated that "as a key member of the leadership team for multiple properties, the Market Director of Sales is accountable for

the revenue generation of those properties and was to report to the Regional Director of Sales & General manager." This statement precisely described Ms. Merilus' duties in her current position. As a result, Ms. Merilus was uniquely qualified for this newly created role.

44.     Fearing that Defendants were discriminating and retaliating against her for taking her maternity-related leave, on or about June 24, 2021, Ms. Merilus sent a follow-up email to Hom in "anticipation of [her] current pregnancy and anticipated October 2021 maternity leave" seeking additional information and clarification from Hom.

45.     On or about June 25, 2021, Hom claimed he was "still working with [Defendant McKibbon's] broker on the issue." Hom never provided any additional information.

46.     On or about July 1, 2021, about a month after Ms. Merilus' position was posted online, Mr. Bruce Baerwalde ("Baerwalde"), Executive President of Operations for Defendant McKibbon, asked to meet with Ms. Merilus in the Hampton & Home 2 Suites Hotel Lobby to discuss the sales structure being implemented after the acquisition.

47.     During the meeting, Baerwalde did not discuss the sales structure and instead, notified Ms. Merilus that her current position had been "eliminated" as part of the acquisition, and that her last day would be July 21, 2021.

48.     Ms. Merilus was extremely upset at the news of her impending termination and felt that Defendants were targeting her because of her pregnancy and requests to take maternity leave. None of Ms. Merilus' colleagues' positions at the Hampton Inn or Home 2 Suites properties had their jobs "eliminated" as part of the acquisition. Only Ms. Merilus' position was set to be eliminated after notifying Defendants of her pregnancy and requesting maternity leave.

49.     Baerwalde further stated there would now be one Market Director of Sales, two Sales Managers and one Sales Coordinator for all four (4) hotels. Baerwalde said that they were already actively interviewing and had even offered the position of Market Director of Sales for the four (4) hotels to another candidate, who had rejected the offer. Baerwalde also stated that the current Sales Manager for the Courtyard & Residence Inn would likely "slide into" one of the Sales Manager roles for the four (4) hotels.

50.     When Ms. Merilus asked Baerwalde why she was not given the position of Market Director of Sales since she was uniquely qualified for that role, Baerwalde simply stated that she would not be given the position but could apply for it if she wanted to. Baerwalde tried to dissuade her from applying and instead recommended that she apply and interview for the lesser position of Sales Manager, which would result in a demotion and salary decrease from Ms. Merilus' current position. It was clear to Ms. Merilus that

Defendants were unlawfully discriminating and retaliating against her for being pregnant and attempting to take maternity leave.

51.     Undeterred by Defendants discouraging her from applying for the position, on or about July 2, 2021, Ms. Merilus told Baerwalde through Royalty that Ms. Merilus was interested in applying and interviewing for the Market Director of Sales position. Baerwalde told Royalty he was "currently interviewing for the position" and that he would reach out to Ms. Merilus to schedule an interview. Baerwalde never contacted Ms. Merilus to interview her as promised.

52.     In opposition to the discrimination and retaliation she was facing, on or about July 9, 2021, Ms. Merilus nonetheless applied for the "Market Director of Sales—Tampa Downtown" position. Ms. Merilus received confirmation of her application the same day from Defendant McKibbon's Human Resources representatives.

53.     On or about July 10, 2021, Defendant McKibbon created a job posting for the Sales Manager position that Baerwalde had previously used to dissuade Ms. Merilus from applying for the position of Market Director of Sales.

54.     Royalty was instructed by Defendants' representatives to encourage Ms. Merilus to quickly apply for the Sales Manager position, as the posting was created solely for Ms. Merilus and Defendants did not want other

job applicants to apply for the position. Royalty acted accordingly and repeatedly asked Ms. Merilus to apply for the Sales Manager position, despite Ms. Merilus expressing her disinterest in the role.

55.     On or about July 19, 2021, just days before Ms. Merilus was to be terminated, Ms. Merilus was asked to meet with ROBERT CLINGER (hereinafter referred to as "Clinger"), Regional Director of Sales & Marketing for Defendant McKiibon, and LYNN PRATER (hereinafter referred to as "Prater"), Senior Vice President of Sales & Marketing for Defendant McKibbon.

56.     Ms. Merilus quickly realized that this meeting was a sham interview. In fact, during the meeting, not a single question was asked about Ms. Merilus' experience, her skills, or the prospective position. Instead, Defendants' representatives used the opportunity to better understand the hotels they were about to acquire. Defendants' representatives questioned Ms. Merilus in-depth about Hampton Inn and Home 2 properties, their operations, and the current staff structure.

57.     When Ms. Merilus inquired about the Director of Sales position for which she was supposedly interviewing for, Defendants' representatives stated that they had "quite a few very strong internal candidates" and that if Ms. Merilus had any questions about the position, she could ask them. At no point

did Defendants' representatives ask Ms. Merilus traditional interview questions or vet Ms. Merilus for the position in any meaningful way.

58.    Defendants did not require any other Liberty Group employees to undergo an interview to retain their employment positions after the acquisition. Defendants' justification for this was that only employees changing from managing two hotels, to all four hotels, were required to interview for positions. Yet another employee, KARI SKILLMAN (hereinafter referred to as "Skillman"), had recently been given the position of Dual/Market Sales Manager of the four hotels without having to interview for the position, even though, like Ms. Merilus, she was coming from two hotel properties.

59.    Ms. Merilus received all of Defendant McKibbon's onboarding emails that were sent to Liberty Group employees, up until the date of her termination. Ms. Merilus later realized this was done in error, as she was the only one of her colleagues who was being terminated.

60.    The same day as Ms. Merilus' termination from her position, Hom asked Ms. Merilus whether she wanted to work as an "independent contractor" until the Market Director of Sales position for all four (4) hotels was filled. Ms. Merilus felt as if she had no choice but to accept the misclassified independent contractor role so that she could continue receive income and provide for her family.

61.     Although Ms. Merilus wanted the position of Market Director of Sales, she accepted the independent contractor role. Ms. Merilus emailed Defendants' representatives on or around July 21, 2021, stating, "I am hoping that, given my experience and past performance, I will be given the MDOS position. In the meantime, I will report to work tomorrow."

62.     In response to Ms. Merilus' email, on or around July 21, 2021, Defendants' representatives plainly told Ms. Merilus that she was not being considered for the Market Director of Sales position.

63.     Defendants wrongly and illegally classified Ms. Merilus as an independent contractor. Ms. Merilus was required to work the very same job title, with the very same duties, yet was denied her employment benefits and was forced to pay the employer portion of federal employment taxes. Ms. Merilus was the only employee forced to work in a misclassified role, as Defendants were targeting her for her pregnancy and her pregnancy-related leave requests.

64.     On or around July 22, 2021, Ms. Merilus began working in the interim independent contractor position. Defendants tasked Ms. Merilus with training the person replacing her, LAURIN FULLER (hereinafter referred to as "Fuller").

65.     Ms. Merilus was confused and upset by the requirement that she train and assist Fuller, who Defendants insisted had superior experience and/or knowledge to that of Ms. Merilus.

66.     Fuller shared this same feeling of confusion herself. Fuller apologized several times for the actions of Defendants and stated that she originally under the assumption that Ms. Merilus and Fuller would be working together as part of the acquisition, not that Fuller would be replacing Ms. Merilus.

67.     Ms. Merilus continued to report to her interim position, training her replacement and working with her former colleagues, none of whom had lost their jobs or been forced to work as independent contractors. Ms. Merilus was often isolated from her co-workers and excluded from staff meetings. Ms. Merilus felt ostracized and embarrassed as a result of the Defendants' conduct.

68.     On or around August 2, 2021, after Ms. Merilus obtained legal representation and notified Defendants that they were engaging in unlawful employment practices, Defendants abruptly changed Ms. Merilus' job from an independent contractor position, back to an employee position. Defendants were aware of the illegal nature of Ms. Merilus' employee misclassification and were trying to avoid liability for their unlawful actions.

69.    On or around August 18, 2021, Ms. Merilus was unlawfully terminated from her interim independent contractor/employee role by Defendants.

70.    The above-described conduct are just some examples of the discriminatory conduct and retaliation to which Defendants subjected Ms. Merilus.

71.    Defendants unlawfully discriminated against Ms. Merilus on the basis of her sex and on the basis of her pregnancy and retaliated against Ms. Merilus for opposing the Defendants' unlawful employment practices.

72.    Defendants' discrimination, retaliation, and unlawful termination against Ms. Merilus is in violation of local, state, and federal laws, including Title VII, the FCRA, and the THRO.

73.    Ms. Merilus claims a continuous practice of discrimination and claims continuing violations and makes all claims herein under the continuing violations doctrine.

74.    At all relevant times, Defendants' employees were acting as agents of Defendants in their discriminatory, retaliatory, and unlawful treatment of Ms. Merilus.

75.    At all relevant times, Defendants acted with deliberate indifference to the discriminatory treatment, hostile work environment, and retaliation complained of herein.

76.     As a result of Defendants' actions, Ms. Merilus felt extremely humiliated, degraded, victimized, embarrassed, and emotionally distressed.

77.     As a result of the acts and conduct complained herein, Ms. Merilus has suffered and will continue to suffer the loss of income, the loss of salary, bonuses, benefits, and other compensation which such employment entails, and Ms. Merilus has also suffered future pecuniary losses, emotional pain, humiliation, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses. Ms. Merilus has further experienced severe emotional and physical distress.

78.     Defendants' conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law, so as to support and justify an award of punitive damages against Defendants.

79.     Defendants are either directly or vicariously responsible for the unlawful facts and conduct complained of herein.

### CAUSES OF ACTION
### COUNT I
### 42 U.S.C. § 2000e-2
### *Sex Discrimination*
### (Plaintiff Merilus as Against all Defendants)

80.     Plaintiff reincorporates the factual allegations in paragraphs 25-79.

81.     Title VII provides, in relevant part, that "it shall be an unlawful employment practice for an employer . . . to discriminate against any individual

with respect to his compensation, terms, conditions, or privileges of employment, because of his race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).

82.     Title VII further provides that "an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e-2(m).

83.     Title VII defines "because of sex" and "on the basis of sex" to include discrimination on the basis of "pregnancy, childbirth, or related medical conditions" and requires that "women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes." 42 U.S.C. § 2000e(k).

84.     Ms. Merilus was a pregnant woman and was therefore a protected class member.

85.     The elements of a prima facie case of disparate treatment are flexible and are tailored on a case-by-case basis to differing factual circumstances.

86.     Defendants subjected Ms. Merilus to discriminatory treatment on the basis of her sex. The Defendants' discriminatory treatment included, but was not limited to, eliminating Ms. Merilus' existing position, interfering with

Ms. Merilus' ability to use her leave benefits, requiring Ms. Merilus to apply and interview in order to retain her existing employment, failing to hire Ms. Merilus for the new Market Director of Sales position, wrongfully misclassifying Ms. Merilus as an independent contractor, requiring Ms. Merilus work in a temporary interim role, and unlawfully terminating Ms. Merilus.

87.    Defendants targeted Ms. Merilus because she was a pregnant female and because she attempted to take maternity leave. No similarly situated non-pregnant employees endured the discriminatory conduct that Ms. Merilus was forced to endure.

88.    The discriminatory actions of the Defendants against Ms. Merilus, as described and set forth above, constitute an adverse employment action for purposes of the Title VII.  In subjecting Ms. Merilus to adverse employment actions, the Defendants intentionally discriminated against Ms. Merilus with respect to the compensation, terms, conditions, or privileges of her employment.

89.    As a direct and proximate result of the Defendants' intentional discriminatory conduct in violation of Title VII, Ms. Merilus has suffered and will continue to suffer financial and economic damages in the form of lost wages (front and back pay) and lost benefits.  Ms. Merilus has also suffered and will continue to suffer emotional distress, mental anguish, loss of dignity, and other

intangible damages Ms. Merilus accordingly demands lost economic damages, lost wages, back pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

90.    The Defendants' actions were knowing, intentional, willful, malicious, and in reckless disregard of Ms. Merilus' rights under Title VII, warranting the imposition of punitive damages, in addition to compensatory damages.

91.    The conduct of the Defendants deprived Ms. Merilus of her statutory rights guaranteed under Title VII.

92.    Ms. Merilus further requests that her attorney's fees and costs be awarded as permitted by law.

<u>**COUNT II**</u>
**42 U.S.C. § 2000e-2**
***Hostile Work Environment***
**(Plaintiff Merilus as Against all Defendants)**

93.    Plaintiff reincorporates the factual allegations in paragraphs 25-79.

94.    Title VII provides, in relevant part, that "it shall be an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of his race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).

95.     Title VII further provides that "an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e-2(m).

96.     Title VII defines "because of sex" and "on the basis of sex" to include discrimination on the basis of "pregnancy, childbirth, or related medical conditions" and requires that "women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes." 42 U.S.C. § 2000e(k).

97.     Ms. Merilus was a pregnant woman and was therefore a protected class member.

98.     The Defendants' discriminatory conduct was severe or pervasive enough to make any reasonable person of the same legally protected class believe that the conditions of employment were altered, and that the working environment was intimidating, hostile, or abusive.

99.     The Defendants' severe and pervasive conduct included, but was not limited to, interfering with Ms. Merilus' ability to use her leave benefits, requiring Ms. Merilus to apply and interview in order to retain her existing employment, failing to meaningfully consider Ms. Merilus for the new Market Director of Sales position, wrongfully misclassifying Ms. Merilus as an

22

independent contractor, requiring Ms. Merilus work in a temporary interim role, isolating Ms. Merilus from the rest of her co-workers, and excluding Ms. Merilus from meetings and/or communications.

100.   Defendants targeted Ms. Merilus because she was a pregnant female and because she attempted to take maternity leave. No similarly situated non-pregnant employees endured the discriminatory conduct that Ms. Merilus was forced to endure.

101.   The Defendants' discriminatory conduct toward Ms. Merilus negatively impacted both her professional life and her personal life. The Defendants' conduct made Ms. Merilus felt isolated, embarrassed, and ashamed.

102.   As a direct and proximate result of the Defendants' intentional discriminatory conduct in violation of Title VII, Ms. Merilus has suffered and will continue to suffer financial and economic damages in the form of lost wages (front and back pay) and lost benefits.  Ms. Merilus has also suffered and will continue to suffer emotional distress, mental anguish, loss of dignity, and other intangible damages Ms. Merilus accordingly demands lost economic damages, lost wages, back pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

103.   The Defendants' actions were knowing, intentional, willful, malicious, and in reckless disregard of the Ms. Merilus' rights under Title VII,

warranting the imposition of punitive damages in addition to compensatory damages.

104.   The conduct of the Defendants deprived Ms. Merilus of her statutory rights guaranteed under Title VII.

105.   Ms. Merilus further requests that her attorney's fees and costs be awarded as permitted by law.

## COUNT III
### 42 U.S.C. § 2000e-3
### *Retaliation*
### (Plaintiff Merilus as Against all Defendants)

106.   Plaintiff reincorporates the factual allegations in paragraphs 25-79.

107.   Title VII prohibits retaliation in any manner against a person who has opposed a discriminatory practice, or who has participated in any investigation, proceeding or hearing related to an unlawful discriminatory practice. 42 U.S.C. § 2000e-3(a).

108.   Ms. Merilus was a pregnant woman and was therefore a protected class member.

109.   Ms. Merilus engaged in a protected activity when she opposed the Defendants' unlawful discriminatory conduct on the basis of her sex and pregnancy.

110.   In response to Ms. Merilus opposing the discriminatory conduct and asserting her right to enjoy the same employment benefits as every other employee, the Defendants retaliated against Ms. Merilus.

111.   Defendants retaliated against Ms. Merilus by engaging in conduct, including but not limited to, eliminating Ms. Merilus' existing position, requiring Ms. Merilus to apply and interview in order to retain her existing employment, failing to hire Ms. Merilus for the new Market Director of Sales position, wrongfully misclassifying Ms. Merilus as an independent contractor, requiring Ms. Merilus work in a temporary interim role, isolating Ms. Merilus from the rest of her co-workers, and excluding Ms. Merilus from meetings and/or communications, and unlawfully terminating Ms. Merilus.

112.   The Defendants took the above-mentioned materially adverse actions, among others, against Ms. Merilus because of her protected activities.

113.   Any reasonable employee in Ms. Merilus' position would be dissuaded from opposing discriminatory conduct if they knew that they would be subjected to the kind of treatment that Ms. Merilus was forced to endure.

114.   The Defendants' alleged bases for its adverse employment actions against Ms. Merilus are pretextual and have been asserted only to cover up the retaliatory nature of Defendants' conduct.

115.   As a direct and proximate result of the Defendants' retaliatory conduct in violation of the Title VII, Ms. Merilus has suffered and will continue

to suffer financial and economic damages in the form of lost wages (front and back pay) and lost benefits.  Ms. Merilus has also suffered and will continue to suffer emotional distress, mental anguish, loss of dignity, and other intangible damages Ms. Merilus accordingly demands lost economic damages, lost wages, back pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

116.   The Defendants' actions were knowing, intentional, willful, malicious, and in reckless disregard of the Ms. Merilus' rights under Title VII, warranting the imposition of punitive damages in addition to compensatory damages.

117.   The conduct of the Defendants deprived Ms. Merilus of her statutory rights guaranteed under Title VII.

118.   Ms. Merilus further requests that her attorney's fees and costs be awarded as permitted by law.

### COUNT IV
### § 760.10(1), Fla. Stat.
### *Sex Discrimination*
### (Plaintiff Merilus as Against all Defendants)

119.   Plaintiff reincorporates the factual allegations in paragraphs 25-79.

120.   The FCRA prohibits employment discrimination in an individual's terms, conditions, and privileges of employment because of the individual's sex or pregnancy. § 760.10(1)(a), Fla. Stat.

121.   Ms. Merilus was a pregnant woman and was therefore a protected class member.

122.   The elements of a prima facie case of disparate treatment are flexible and are tailored on a case-by-case basis to differing factual circumstances.

123.   Defendants subjected Ms. Merilus to discriminatory treatment on the basis of her sex. The Defendants' discriminatory treatment included, but was not limited to, eliminating Ms. Merilus' existing position, interfering with Ms. Merilus' ability to use her leave benefits, requiring Ms. Merilus to apply and interview in order to retain her existing employment, failing to hire Ms. Merilus for the new Market Director of Sales position, wrongfully misclassifying Ms. Merilus as an independent contractor, requiring Ms. Merilus work in a temporary interim role, and unlawfully terminating Ms. Merilus.

124.   Defendants targeted Ms. Merilus because she was a pregnant female and because she attempted to take maternity leave. No similarly situated non-pregnant employees endured the discriminatory conduct that Ms. Merilus was forced to endure.

125.   The discriminatory actions of the Defendants against Ms. Merilus, as described and set forth above, constitute an adverse employment action for purposes of the FCRA.  In subjecting Ms. Merilus to adverse employment actions, the Defendants intentionally discriminated against Ms. Merilus with respect to the compensation, terms, conditions, or privileges of her employment.

126.   As a direct and proximate result of the Defendants' intentional discriminatory conduct in violation of the FCRA, Ms. Merilus has suffered and will continue to suffer financial and economic damages in the form of lost wages (front and back pay) and lost benefits.  Ms. Merilus has also suffered and will continue to suffer emotional distress, mental anguish, loss of dignity, and other intangible damages Ms. Merilus accordingly demands lost economic damages, lost wages, back pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

127. The Defendants' actions were knowing, intentional, willful, malicious, and in reckless disregard of Ms. Merilus' rights under the FCRA, warranting the imposition of punitive damages in addition to compensatory damages.

128. The conduct of the Defendants deprived Ms. Merilus of her statutory rights guaranteed under the FCRA.

129.   Ms. Merilus further requests that her attorney's fees and costs be awarded as permitted by law.

**COUNT V**
**§ 760.10(1), Fla. Stat.**
*Hostile Work Environment*
**(Plaintiff Merilus as Against all Defendants)**

130.   Plaintiff reincorporates the factual allegations in paragraphs 25-79.

131.   The FCRA prohibits employment discrimination in an individual's terms, conditions, and privileges of employment because of the individual's sex or pregnancy. § 760.10(1), Fla. Stat.

132.   Ms. Merilus was a pregnant woman and was therefore a protected class member.

133.   The Defendants' discriminatory conduct was severe or pervasive enough to make any reasonable person of the same legally protected class believe that the conditions of employment were altered, and that the working environment was intimidating, hostile, or abusive.

134.   The Defendants' severe and pervasive conduct included, but was not limited to, interfering with Ms. Merilus' ability to use her leave benefits, requiring Ms. Merilus to apply and interview in order to retain her existing employment, failing to meaningfully consider Ms. Merilus for the new Market Director of Sales position, wrongfully misclassifying Ms. Merilus as an

independent contractor, requiring Ms. Merilus work in a temporary interim role, isolating Ms. Merilus from the rest of her co-workers, and excluding Ms. Merilus from meetings and/or communications.

135.   Defendants targeted Ms. Merilus because she was a pregnant female and because she attempted to take maternity leave. No similarly situated non-pregnant employees endured the discriminatory conduct that Ms. Merilus was forced to endure.

136.   The Defendants' discriminatory conduct toward Ms. Merilus negatively impacted both her professional life and her personal life. The Defendants' conduct made Ms. Merilus felt isolated, embarrassed, and ashamed.

137.   As a direct and proximate result of the Defendants' intentional discriminatory conduct in violation of the FCRA, Ms. Merilus has suffered and will continue to suffer financial and economic damages in the form of lost wages (front and back pay) and lost benefits.  Ms. Merilus has also suffered and will continue to suffer emotional distress, mental anguish, loss of dignity, and other intangible damages Ms. Merilus accordingly demands lost economic damages, lost wages, back pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

138.   The Defendants' actions were knowing, intentional, willful, malicious, and in reckless disregard of the Ms. Merilus' rights under the FCRA,

warranting the imposition of punitive damages in addition to compensatory damages.

139.   The conduct of the Defendants deprived Ms. Merilus of her statutory rights guaranteed under the FCRA.

140.   Ms. Merilus further requests that her attorney's fees and costs be awarded as permitted by law.

## COUNT VI
### § 760.10(7), Fla. Stat.
### *Retaliation*
### (Plaintiff Merilus as Against all Defendants)

141.   Plaintiff reincorporates the factual allegations in paragraphs 25-79.

142.   The FCRA prohibits retaliation in any manner against a person who has opposed a discriminatory practice, or who has participated in any investigation, proceeding or hearing related to an unlawful discriminatory practice. § 760.10(1), Fla. Stat.

143.   Ms. Merilus was a pregnant woman and was therefore a protected class member.

144.   Ms. Merilus engaged in a protected activity when she opposed the Defendants' unlawful discriminatory conduct on the basis of her sex and pregnancy.

145.   In response to Ms. Merilus opposing the discriminatory conduct and asserting her right to enjoy the same employment benefits as every other employee, the Defendants retaliated against Ms. Merilus.

146.   Defendants retaliated against Ms. Merilus by engaging in conduct, including but not limited to, eliminating Ms. Merilus' existing position, requiring Ms. Merilus to apply and interview in order to retain her existing employment, failing to hire Ms. Merilus for the new Market Director of Sales position, wrongfully misclassifying Ms. Merilus as an independent contractor, requiring Ms. Merilus work in a temporary interim role, isolating Ms. Merilus from the rest of her co-workers, and excluding Ms. Merilus from meetings and/or communications, and unlawfully terminating Ms. Merilus.

147.   The Defendants took the above-mentioned materially adverse actions, among others, against Ms. Merilus because of her protected activities.

148.   Any reasonable employee in Ms. Merilus' position would be dissuaded from opposing discriminatory conduct if they knew that they would be subjected to the kind of treatment that Ms. Merilus was forced to endure.

149.   The Defendants' alleged bases for its adverse employment actions against Ms. Merilus are pretextual and have been asserted only to cover up the retaliatory nature of Defendants' conduct.

150.   As a direct and proximate result of the Defendants' retaliatory conduct in violation of the FCRA, Ms. Merilus has suffered and will continue

to suffer financial and economic damages in the form of lost wages (front and back pay) and lost benefits.  Ms. Merilus has also suffered and will continue to suffer emotional distress, mental anguish, loss of dignity, and other intangible damages Ms. Merilus accordingly demands lost economic damages, lost wages, back pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

151.   The Defendants' actions were knowing, intentional, willful, malicious, and in reckless disregard of the Ms. Merilus' rights under the FCRA, warranting the imposition of punitive damages in addition to compensatory damages.

152.   The conduct of the Defendants deprived Ms. Merilus of her statutory rights guaranteed under the FCRA.

153.   Ms. Merilus further requests that her attorney's fees and costs be awarded as permitted by law.

**<u>COUNT VII</u>**
**CITY OF TAMPA CODE § 12-26(a)**
***Sex Discrimination***
**(Plaintiff Merilus as Against all Defendants)**

154.   Plaintiff reincorporates the factual allegations in paragraphs 25-79.

155.  § 12-26(a)(1), City of Tampa, Code of Ordinances, prohibits discrimination with respect to compensation, terms, conditions, or privileges of employment because of an individual's sex.

156.  § 12-17, City of Tampa, Code of Ordinances, defines "because of sex" and "on the basis of sex" to include discrimination on the basis of "pregnancy, childbirth, or related medical conditions" and requires that "women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes."

157.  Ms. Merilus was a pregnant woman and was therefore a protected class member.

158.  The elements of a prima facie case of disparate treatment are flexible and are tailored on a case-by-case basis to differing factual circumstances.

159.  Defendants subjected Ms. Merilus to discriminatory treatment on the basis of her sex. The Defendants' discriminatory treatment included, but was not limited to, eliminating Ms. Merilus' existing position, interfering with Ms. Merilus' ability to use her leave benefits, requiring Ms. Merilus to apply and interview in order to retain her existing employment, failing to hire Ms. Merilus for the new Market Director of Sales position, wrongfully misclassifying Ms. Merilus as an independent contractor, requiring Ms.

Merilus work in a temporary interim role, and unlawfully terminating Ms. Merilus.

160.  Defendants targeted Ms. Merilus because she was a pregnant female and because she attempted to take maternity leave. No similarly situated non-pregnant employees endured the discriminatory conduct that Ms. Merilus was forced to endure.

161.  The discriminatory actions of the Defendants against Ms. Merilus, as described and set forth above, constitute an adverse employment action for purposes of the THRO.  In subjecting Ms. Merilus to adverse employment actions, the Defendants intentionally discriminated against Ms. Merilus with respect to the compensation, terms, conditions, or privileges of her employment.

162.  As a direct and proximate result of the Defendants' intentional discriminatory conduct in violation of the THRO, Ms. Merilus has suffered and will continue to suffer financial and economic damages in the form of lost wages (front and back pay) and lost benefits.  Ms. Merilus has also suffered and will continue to suffer emotional distress, mental anguish, loss of dignity, and other intangible damages Ms. Merilus accordingly demands lost economic damages, lost wages, back pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

163.   The Defendants' actions were knowing, intentional, willful, malicious, and in reckless disregard of the Ms. Merilus' rights under the THRO, warranting the imposition of punitive damages in addition to compensatory damages.

164.   The conduct of the Defendants deprived Ms. Merilus of her protected rights guaranteed under the THRO.

165.   Ms. Merilus further requests that her attorney's fees and costs be awarded as permitted by law.

**COUNT VIII**
**CITY OF TAMPA CODE § 12-26(a)**
*Hostile Work Environment*
**(Plaintiff Merilus as Against all Defendants)**

166.   Plaintiff reincorporates the factual allegations in paragraphs 25-79.

167.   § 12-26(a)(1), City of Tampa, Code of Ordinances, prohibits discrimination with respect to compensation, terms, conditions, or privileges of employment because of an individual's sex.

168.   § 12-17, City of Tampa, Code of Ordinances, defines "because of sex" and "on the basis of sex" to include discrimination on the basis of "pregnancy, childbirth, or related medical conditions" and requires that "women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes."

169.   Ms. Merilus was a pregnant woman and was therefore a protected class member.

170.   The Defendants' discriminatory conduct was severe or pervasive enough to make any reasonable person of the same legally protected class believe that the conditions of employment were altered, and that the working environment was intimidating, hostile, or abusive.

171.   The Defendants' severe and pervasive conduct included, but was not limited to, interfering with Ms. Merilus' ability to use her leave benefits, requiring Ms. Merilus to apply and interview in order to retain her existing employment, failing to meaningfully consider Ms. Merilus for the new Market Director of Sales position, wrongfully misclassifying Ms. Merilus as an independent contractor, requiring Ms. Merilus work in a temporary interim role, isolating Ms. Merilus from the rest of her co-workers, and excluding Ms. Merilus from meetings and/or communications.

172.   Defendants targeted Ms. Merilus because she was a pregnant female and because she attempted to take maternity leave. No similarly situated non-pregnant employees endured the discriminatory conduct that Ms. Merilus was forced to endure.

173.   The Defendants' discriminatory conduct toward Ms. Merilus negatively impacted both her professional life and her personal life. The

Defendants' conduct made Ms. Merilus felt isolated, embarrassed, and ashamed.

174.   As a direct and proximate result of the Defendants' intentional discriminatory conduct in violation of the THRO, Ms. Merilus has suffered and will continue to suffer financial and economic damages in the form of lost wages (front and back pay) and lost benefits.  Ms. Merilus has also suffered and will continue to suffer emotional distress, mental anguish, loss of dignity, and other intangible damages Ms. Merilus accordingly demands lost economic damages, lost wages, back pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

175.   The Defendants' actions were knowing, intentional, willful, malicious, and in reckless disregard of the Ms. Merilus' rights under the THRO, warranting the imposition of punitive damages in addition to compensatory damages.

176.   The conduct of the Defendants deprived Ms. Merilus of her protected rights guaranteed under the THRO.

177.   Ms. Merilus further requests that her attorney's fees and costs be awarded as permitted by law.

**COUNT IX**
**CITY OF TAMPA CODE § 12-26(e)**
***Retaliation***
**(Plaintiff Merilus as Against all Defendants)**

178.   Plaintiff reincorporates the factual allegations in paragraphs 25-79.

179.   § 12-26(e), City of Tampa, Code of Ordinances, prohibits retaliation in any manner against a person who has opposed an unlawful employment practice, or who has participated in any investigation, proceeding or hearing related to an unlawful employment practice.

180.   Ms. Merilus was a pregnant woman and was therefore a protected class member.

181.   Ms. Merilus engaged in a protected activity when she opposed the Defendants' unlawful discriminatory conduct on the basis of her sex and pregnancy.

182.   In response to Ms. Merilus opposing the discriminatory conduct and asserting her right to enjoy the same employment benefits as every other employee, the Defendants retaliated against Ms. Merilus.

183.   Defendants retaliated against Ms. Merilus by engaging in conduct, including but not limited to, eliminating Ms. Merilus' existing position, requiring Ms. Merilus to apply and interview in order to retain her existing employment, failing to hire Ms. Merilus for the new Market Director of Sales position, wrongfully misclassifying Ms. Merilus as an independent contractor, requiring Ms. Merilus work in a temporary interim role, isolating Ms. Merilus

from the rest of her co-workers, and excluding Ms. Merilus from meetings and/or communications, and unlawfully terminating Ms. Merilus.

184.   The Defendants took the above-mentioned materially adverse actions, among others, against Ms. Merilus because of her protected activities.

185.   Any reasonable employee in Ms. Merilus' position would be dissuaded from opposing discriminatory conduct if they knew that they would be subjected to the kind of treatment that Ms. Merilus was forced to endure.

186.   The Defendants' alleged bases for its adverse employment actions against Ms. Merilus are pretextual and have been asserted only to cover up the retaliatory nature of Defendants' conduct.

187.   As a direct and proximate result of the Defendants' retaliatory conduct in violation of the THRO, Ms. Merilus has suffered and will continue to suffer financial and economic damages in the form of lost wages (front and back pay) and lost benefits.  Ms. Merilus has also suffered and will continue to suffer emotional distress, mental anguish, loss of dignity, and other intangible damages Ms. Merilus accordingly demands lost economic damages, lost wages, back pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

188.   The Defendants' actions were knowing, intentional, willful, malicious, and in reckless disregard of the Ms. Merilus' rights under the

THRO, warranting the imposition of punitive damages in addition to compensatory damages.

189.   The conduct of the Defendants deprived Ms. Merilus of her protected rights guaranteed under the THRO

190.   Ms. Merilus further requests that her attorney's fees and costs be awarded as permitted by law.

## JURY DEMAND

Plaintiff Kimberly Merilus hereby demands a jury trial on all issues to be tried.

## PRAYER FOR RELIEF

**WHEREFORE**, the Plaintiff respectfully requests this Court enter judgment against the Defendants for all damages suffered by the Plaintiff, including economic damages, lost wages (back pay and front pay) and benefits, liquidated damages, statutory damages, compensatory damages, emotional distress damages, punitive damages, interest, attorney's fees and costs, disbursements of action, and any other remedies (monetary and/or equitable) allowable by law as a result of the Defendants' conduct in violation of  Title VII, the FCRA, and the THRO.

Dated:  Miami, Florida          **DEREK SMITH LAW GROUP, PLLC**
            October 20, 2022,          *Counsel for Plaintiff*

                                            /s/ Kyle T. MacDonald
                                            Kyle T. MacDonald, Esq.
                                            Florida Bar No.: 1038749
                                            Derek Smith Law Group, PLLC
                                            701 Brickell Ave, Suite 1310
                                            Miami, FL 33131
                                            Tel: (305) 946-1884
                                            Fax: (305) 503-6741
                                            Kyle@dereksmithlaw.com